IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:06-CV-469-D

| | | |
|---|---|---|
| JAMES L. WITHERSPOON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| NORFOLK SOUTHERN CORPORATION, | ) | |
| d/b/a NORFOLK SOUTHERN RAILWAY | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

On November 1, 2007, defendant Norfolk Southern Railway Company ("NS") moved for

summary judgment in this Title VII action. On January 18, 2008, plaintiff James L. Witherspoon

("Witherspoon") responded in opposition. Although Witherspoon contends that NS terminated his

employment as a conductor trainee due to his race, NS terminated Witherspoon's employment

because he violated NS's zero-tolerance alcohol policy. Moreover, NS took no other adverse

employment action against Witherspoon due to his race. Accordingly, as explained below,

defendant's motion for summary judgment is granted.

I.

The court considers the facts in the light most favorable to the non-moving party. See, e.g.,

United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam). Witherspoon, an African-

American male, saw a newspaper advertisement for an NS employment fair to be held in Raleigh,

North Carolina on October 20, 2005. See Def.'s Mem. in Supp. of Mot. for Summ. J. [hereinafter

"Def.'s Mem."] Attach. 6 [hereinafter "Pl.'s Dep."], at 7:16–13:2 & Ex. C. Witherspoon attended

the employment fair and listened to NS recruiters describe the benefits of working for the company.

See Pl.'s Dep. 12:2–14:6. The recruiters discussed the sacrifices that working for NS required. Id. at 19:1–20:13. In particular, the recruiters said:

> Here's another lifestyle issue you need to consider if you like to party with your friends or just have a glass of wine with dinner. Norfolk Southern has a zero tolerance policy with respect to drugs and alcohol. If any of that glass of wine with dinner or beer from the party is still in your system when you report to work, you will be fired. The same holds true for drugs. As a conductor, you will be subject to random drug testing. Periodically you will be called to work and greeted by a trainmaster and a technician who will require you to provide a urine sample right there on the spot. And if you test positive for an illegal substance, you don't work for us, period.
>
> Now there's a very good reason for this. As I mentioned, Norfolk Southern is the safest railroad in the country. We put safety above everything else, and we value your safety. You will be working around moving equipment, climbing up and down and in between rail cars and trains, and working in train yards. You must be alert and unimpaired. Your life and the lives of your fellow workers and the community in which you work are far too important and there is no room for error. Simply put, drug and alcohol use and the railroad do not mix!

Def.'s Mem. Attach. 2, Ex. 2, at 13. NS recruiters told the potential employees to ask themselves whether they could "refrain from drug and alcohol use for [their] entire career [with the railroad]." Id. at 14; see also Pl.'s Dep. 20:14–20:24. After hearing the NS recruiters, Witherspoon decided that he was interested in becoming a train conductor. Witherspoon took a required test, applied for the position, received an interview with a human resources consultant and NS operations manager Arnold Reed ("Reed"), and was hired as a conductor trainee. See Pl.'s Dep. 15:7–16:25, 23:21–23:24; Def.'s Mem. Attach. 5, ¶¶ 3–4. Reed is a Caucasian male. See Compl. ¶ 7.

In early November 2005, Witherspoon reported to the train depot in Raleigh, North Carolina for initial orientation with Reed. See Pl.'s Dep. 25:1–25:10. Reed met Witherspoon at the depot, congratulated him on receiving the job, and told him that he would be going to training in McDonough, Georgia. See id. at 25:11–25:16. According to Witherspoon, Reed then told Witherspoon something to the effect of, "Don't go down to [McDonough] with your pants hanging

2

down because I know that's how the black guys dress, but congratulations." Id. at 25:16–25:19.

Witherspoon was placed into NS's conductor trainee program, which consists of four phases and takes approximately five months to complete. See id. at 26:20–28:20. A trainee who successfully passes all four phases continues on probationary employment status for two more months, and then becomes a full-status employee if his or her application is not rejected before that time. See Def.'s Mem. Attach. 2, ¶¶ 10–11; Def.'s Mem. Attach. 3, ¶ 15. During probationary employment, the employee can be terminated without cause or a prior disciplinary hearing. See Def.'s Mem. Attach. 3, ¶ 11.

Witherspoon reported to the McDonough training site near the end of November 2005. Pl.'s Dep. 25:20–26:10. As a part of the training program, Witherspoon received a rule book, which he was required to and did read. Id. at 88:21–89:23. One rule provided:

> An employee who reports for duty under the influence of alcohol or other intoxicant . . . , or who uses any of the foregoing while on duty, will be dismissed. Possession of any of the foregoing while on duty, or possession, use, or being under the influence of any of the foregoing while on Company property or occupying facilities provided by the Company is prohibited.

Pl.'s Dep. Ex. S. While in training, Witherspoon and Richard Carlos Moore ("Moore"), an engineer with whom he trained, violated this rule by drinking alcohol during a cab ride home from the train yard after he and Moore had finished substantive work but were still technically on company time because they had not yet turned in their time sheets for the day. See Pl.'s Dep. 67:12–68:16. No one at NS management knew about this incident. See id. Moore is a Caucasian male. See Pl.'s Dep. Ex. K.

At some point during Witherspoon's training, NS held a "diversity day." See Pl.'s Dep. 80:16–81:8. The diversity day involved employee training on business diversification, not social or racial diversity. See id. At this event, Witherspoon heard Reed and a man he would later

3

recognize as Special Agent Lloyd Cline of the Norfolk Southern Police Department ("Cline") making fun of the event. See id.; Def.'s Mem. Attach. 4, ¶ 1. Cline is a Caucasian male. See Compl. ¶ 7. Reed and Cline made jokes and statements to the effect of, "Oh, you know, we're about to be diversified, we're about to be diversified today." See Pl.'s Dep. 80:16–80:22.

While attending the diversity day, Witherspoon met another African-American NS employee and asked him how to apply for a promotion. Id. at 41:7–41:22. This individual told Witherspoon that he would have to apply for promotions at a NS website, and he showed Witherspoon how to apply. Id. In February 2006, Witherspoon spoke to Reed's supervisor, East Carolina Business Unit manager Jay Traywick ("Traywick"), about promotion to management. See Def.'s Mem. Attach. 3, ¶¶ 8–9. Traywick is a Caucasian male. See Compl. ¶ 7. Traywick encouraged Witherspoon to follow the required steps for applying for a promotion through NS's online personnel system, known as "CareerTrack." Def.'s Mem. Attach. 3, ¶¶ 8–9.

Applying for a management position through the NS CareerTrack program requires six steps. See Def.'s Mem. Attach. 2, ¶¶ 13–18. First, the employee must take a management assessment test. See Def.'s Mem. 7; Pl.'s Dep. 43:11–43:18. Second, the employee must log into the CareerTrack program so as to view information on potential jobs that interest the employee. See Def.'s Mem. 7; id. Attach. 2, ¶ 14. Third, the employee must create an electronic resume and a list of jobs that the employee might be interested in, known as a "Career Preference List." See Def.'s Mem. 7; id. Attach. 2, ¶ 14. Merely creating the resume and the Career Preference List does not constitute a completed application for any position. See Def.'s Mem. 7; id. Attach. 2, ¶¶ 14–16. Rather, whenever a position on an employee's Career Preference List opens, the CareerTrack system will send the employee an email asking the employee whether he or she wishes to apply for the position. See Def.'s Mem. Attach. 2, ¶¶ 14–16. Only when the employee clicks "apply" in response to this

4

email alert is the fourth step completed and the employee's application actually submitted. See id. The fifth step involves NS personnel reviewing the applications and selecting the most qualified employees for interviews, and the sixth step is the job interview itself. See id. ¶¶ 17–18.

On March 12, 2006, after receiving his test scores, Witherspoon went online to the CareerTrack program, created and uploaded a resume, and created a Career Preference List. See Pl.'s Dep. 43:1–46:3; id. Exs. F & G. Witherspoon did not receive any email alerts and consequently did not click "apply" in response to any email alerts; however, he believed that he had completed all the steps necessary to apply for a promotion to management. See Pl.'s Dep. 47:7–47:8. Consequently, Witherspoon did not actually complete the application for a promotion. See id.; Def.'s Mem. Attach. 2, ¶¶ 14–16. During the night of March 12, 2006, Witherspoon drank "[p]robably like a six pack" of beer. Pl.'s Dep. 59:11–59:13.

The next day, March 13, 2006, Witherspoon reported for work at approximately 9:30 p.m. Id. at 56:20–56:24. Witherspoon boarded the engine car with engineer Cecil Byrd ("Byrd"). See id. at 58:2–58:11. Byrd approached Witherspoon and asked if he had been drinking, and Witherspoon said that he had been drinking the night before. Id. Byrd then got off the train and made phone calls to Reed and Cline. Id. at 59:18–59:24. Reed and Cline came down to the train yard and asked Witherspoon if he had been drinking, to which Witherspoon again replied that he had been drinking the night before. Id. Reed and Cline then placed a call to an NS toxicologist and told Witherspoon to sit and wait. See id. at 59:22–60:3.

Pursuant to NS policy, whenever there is reasonable suspicion that an employee has used alcohol, a NS toxicologist will perform a breathalyzer test. See Def.'s Mem. Attach. 1, ¶¶ 5–6. If the breathalyzer test shows the presence of any alcohol, then the employee must undergo a second breathalyzer test, known as a confirmation test, 15 to 30 minutes later. See id. ¶ 7. The purpose of

5

the time delay and confirmation test is to ensure that any alcohol in the mouth (such as that sometimes associated with mouthwash) has time to dissipate. Id. The confirmation test is very important to NS, and is the only test that the company uses in making disciplinary determinations. See id. ¶ 9. For example, on February 17, 2006, Witherspoon was subjected to a random breathalyzer test which did in fact show that Witherspoon had alcohol in his system, but the confirmatory test detected no alcohol, and Witherspoon accordingly passed the random screen. See id. ¶ 11. Because the confirmatory test is so important to NS, during the delay between the first test and the confirmation test, the employee may not eat, drink, smoke cigarettes, chew gum, or do anything that might interfere with the accuracy of the confirmation test. Id. ¶ 8.

At 12:39 a.m. on March 14, 2006, Witherspoon's breathalyzer test indicated his alcohol concentration was 0.025 percent. Pl.'s Dep. Ex. H. The confirmatory test was conducted at 12:56 a.m., and showed that Witherspoon's alcohol concentration was 0.019 percent. Id. The toxicologist completed a Department of Transportation alcohol testing form and affixed Witherspoon's breathalyzer results thereto. See id. At the bottom of the form is an acknowledgment by the testee that the testee is not permitted to perform safety-restrictive duties because his or her alcohol concentration is greater than 0.02 percent. See id. Although Witherspoon's alcohol concentration was not in fact greater than 0.02 percent under his confirmatory test, Reed had Witherspoon sign the acknowledgment because NS has a zero-tolerance policy with respect to alcohol. See Pl.'s Dep. 61:1–61:8.

After the test, Reed told Witherspoon that he was being suspended pending further review for violating the company's zero-tolerance policy with respect to alcohol. See Def.'s Mem. Attach. 3, Ex. 1, at 1. When Witherspoon said that he was going to drive home, Reed and Cline threatened

6

to call the police. See Compl. ¶ 9 (addendum). Reed and Cline then drove Witherspoon home. See

Pl.'s Dep. 62:8–62:12.

On March 14, 2006, Witherspoon's supervising trainmaster, R.J. Thrift ("Thrift") notified

Traywick of Witherspoon's violation. See Def.'s Mem. Attach. 3, ¶¶ 10–11 & Ex. 1. Thrift is a

Caucasian male. See Compl. ¶ 7. Traywick terminated Witherspoon's probationary employment

with NS effective March 16, 2006, because Witherspoon violated NS's zero-tolerance alcohol

policy. Def.'s Mem. Attach. 3 ¶¶ 12–16 & Ex. 1. Traywick is the only NS employee in the East

Carolina Business Unit with the authority to fire employees. Def.'s Mem. Attach. 3, ¶ 2.

On June 15, 2006, Witherspoon filed a race discrimination charge with the Equal

Employment Opportunity Commission ("EEOC"). See Pl.'s Dep. Exs. J & K. On August 25,

2006, the EEOC dismissed the charge and provided a right-to-sue letter. See Pl.'s Dep. Ex. M. On

November 9, 2006, Witherspoon filed suit in this court and alleges that NS disciplined him,

terminated him, and failed to promote him due to his race. See Compl. ¶ 4.

## II.

Witherspoon lacks direct evidence of race discrimination in violation of Title VII, and

therefore proceeds under the burden-shifting framework first announced in McDonnell Douglas

Corp. v. Green, 411 U.S. 792 (1973). Under Title VII of the Civil Rights Act of 1964, it is unlawful

for an employer "to discharge any individual, or otherwise discriminate against any individual with

respect to his compensation, terms, conditions, or privileges of employment, because of such

individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may prove race discrimination under

the burden-shifting framework of McDonnell Douglas by following a three-step process. First, the

plaintiff must establish a prima facie case of discrimination. See, e.g., St. Mary's Honor Ctr. v.

Hicks, 509 U.S. 502, 506 (1993); Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252–53

7

(1981).  If the plaintiff establishes a prima facie case, then the burden of production shifts to the defendant to produce evidence that the defendant took the adverse employment action for a legitimate, nondiscriminatory reason.  See, e.g., St. Mary's Honor Ctr., 509 U.S. at 506–07; Burdine, 450 U.S. at 253–54.  If the defendant meets its burden of production, then the plaintiff must prove by a preponderance of the evidence that the employer's stated reason for taking the adverse employment action was in fact a mere pretext for discrimination.  See, e.g., Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000); Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004) (en banc).  In analyzing this framework, the court applies the familiar law of summary judgment.  See, e.g., Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Diebold, 369 U.S. at 655.

A.

Witherspoon alleges discriminatory discipline.  See, e.g., Compl. ¶ 4; Pl.'s Dep. Ex. K ("I also believe that this policy is not enforced, as I am aware . . . of other employees, including Richard Carlos Moore (white), Engineer, who have purchased and consumed alcohol during working hours on a regular basis; however, Mr. Moore has not been disciplined or discharged.").  Under the first step of the McDonnell Douglas analysis, Witherspoon must establish a prima facie case of racially discriminatory discipline.  To establish a prima facie case, Witherspoon must prove by a preponderance of the evidence that (1) he is a member of a protected class; (2) the prohibited conduct in which he engaged was comparable in seriousness to misconduct of similarly-situated employees outside the protected class; and (3) the disciplinary measures enforced against him were more severe than those enforced against those other similarly-situated employees.  See, e.g., Cook v. CSX Transp. Corp., 988 F.2d 507, 511 (4th Cir. 1993); Moore v. City of Charlotte, 754 F.2d 1100,

8

1105–06 (4th Cir. 1985); see also Edwards v. Newport News Shipbuilding & Dry Dock Co., No. 98-1338, 1998 WL 841567, at *2 (4th Cir. Dec. 7, 1998) (per curiam) (unpublished) ("With respect to discharge for violation of work rules, the plaintiff must first demonstrate by a preponderance of the evidence either that he did not violate the rule or that, if he did, similarly situated employees who were not members of a protected class engaged in similar acts and were not punished similarly.").

Witherspoon meets the protected class requirement. In attempting to meet the second and third requirements, Witherspoon relies on a comparison with Moore, the engineer with whom he once drank alcohol in a taxicab while on company time. See Pl.'s Dep. Ex. K. However, Moore is not "similarly situated" to Witherspoon for at least two reasons. First, Witherspoon was a probationary employee whose employment could be terminated without the protections afforded to non-probationary employees like Moore. See, e.g., Cronquist v. City of Minneapolis, 237 F.3d 920, 928 (8th Cir. 2001) ("[Plaintiff] has the burden of proving that [he] and the other [employees] were similarly situated in all relevant respects. The test for whether employees are similarly situated to warrant a comparison to the plaintiff is rigorous." (citations and quotations omitted)); Heyward v. Monroe, No. 97-2430, 1998 WL 841494, at *2 (4th Cir. Dec. 7, 1998) (per curiam) (unpublished) ("[Plaintiff] must show that [the employees being compared] are similar in all relevant respects."); McNeal v. Kansas City S. Ry. Co., No. 05 CV 0791, 2007 WL 3010201, at *1 n.1 (W.D. La. Oct. 12, 2007) (unpublished) ("[Other railroad employees'] status as permanent union employees compared to Plaintiff's status as a probationary employee preclude them from being considered 'nearly identical' to Plaintiff.").

Second, Witherspoon and Moore were not similarly situated because NS did not know about Moore's alleged misconduct. Witherspoon admits that no one reported the taxicab drinking incident to NS management. See Pl.'s Dep. 68:8–68:14. Unknown misconduct is not "similar in

9

all relevant respects" to known misconduct. Heyward, 1998 WL 841494, at *2; McDougal-Wilson v. Goodyear Tire & Rubber Co., 427 F. Supp. 2d 595, 610 (E.D.N.C. 2006). Witherspoon has failed to cite evidence from which a rational factfinder could conclude by a preponderance of the evidence that NS disciplined him more severely due to his race. Accordingly, NS is entitled to summary judgment on plaintiff's discriminatory discipline claim.

B.

The court next considers Witherspoon's discriminatory discharge claim. See Compl. ¶ 4. Under the McDonnell Douglas framework, Witherspoon must first establish a prima facie case. To establish a prima facie case of discriminatory discharge, Witherspoon must show that (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) at the time he suffered the adverse employment action he was meeting his employer's legitimate job expectations; and (4) his position remained open or was filled by a similarly-qualified applicant outside the protected class after his termination. See, e.g., Warch v. Ohio Cas. Ins. Co., 435 F.3d 510, 513 (4th Cir. 2006); King v. Rumsfeld, 328 F.3d 145, 149 (4th Cir. 2003); cf. Miles v. Dell, Inc., 429 F.3d 480, 485–89 (4th Cir. 2005).

Witherspoon is a member of a protected class, and his termination constitutes an adverse employment action. Witherspoon, however, has failed to show that he was meeting his employer's legitimate job expectations at the time he was terminated. NS was clear about its expectations with respect to alcohol: If any detectable amount of alcohol is present in an employee's body when the employee in on duty, the employee will be fired. See, e.g., Def.'s Mem. Attach. 2, Ex. 2, at 13–14; Pl.'s Dep. 20:14–20:24 & Ex. S. Witherspoon questions how Byrd suspected he had been drinking. See Pl.'s Dep. 69:13–69:17. Nonetheless, Witherspoon does not dispute that he drank approximately a six pack of beer on March 12, 2006, or dispute that his confirmatory breathalyzer

10

test (taken approximately 24 hours after consuming the beer) showed a detectable level of alcohol in his system. By having a detectable level of alcohol in his system while on duty, Witherspoon was not meeting his employer's legitimate job expectations. Accordingly, NS is entitled to summary judgment on plaintiff's discriminatory discharge claim.

Alternatively, even if Witherspoon could make out a prima facie case under a discriminatory discharge theory, summary judgment would still be appropriate. No rational factfinder could find by a preponderance of the evidence that NS's stated reason for dismissing Witherspoon was in fact a mere pretext for race discrimination. See, e.g., Reeves, 530 U.S. at 143; Hill, 354 F.3d at 285. "[T]he plaintiff can prove pretext by showing that the [employer's] explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of [discrimination]." Price v. Thompson, 380 F.3d 209, 212 (4th Cir. 2004) (quotations omitted); Mereish v. Walker, 359 F.3d 330, 336 (4th Cir. 2004). NS repeatedly warned its actual and potential employees that having alcohol in your system while on duty was strictly forbidden and would result in termination. When Witherspoon violated the policy, NS terminated his employment.

In an effort to attack NS's reason as pretextual, Witherspoon cites the alleged remarks of Reed and Cline. Under the summary judgment standard, the court assumes the truth of the alleged remarks of Reed and Cline concerning "diversity day" and the alleged remark of Reed concerning baggy pants. Nevertheless, these remarks do not create a genuine issue of material fact concerning pretext. See, e.g., Mereish, 359 F.3d at 336–37. The remarks were remote in time from and unrelated to the termination decision. Further, Traywick was the decisonmaker and there is no evidence that he ever made racially insensitive comments or harbored any racial animus. See, e.g., Hill, 354 F.3d at 289–98. The record simply contains no evidence from which a rational factfinder could conclude by a preponderance of the evidence that NS's explanation for firing Witherspoon was

11

a mere pretext to mask race discrimination. Accordingly, NS's motion for summary judgment is granted with respect to Witherspoon's discriminatory discharge claim.

C.

Finally, Witherspoon alleges that NS failed to promote him because of his race. Compl. ¶ 4. Again, Witherspoon lacks direct evidence of race discrimination and proceeds under the McDonnell Douglas framework. See, e.g., Reeves, 530 U.S. at 143; St. Mary's Honor Ctr., 509 U.S. at 506–07; Burdine, 450 U.S. at 252–54; Hill, 354 F.3d at 285. To establish a prima facie case of a discriminatory failure to promote, a plaintiff must show that "(1) he is a member of a protected group; (2) he applied for the position in question; (3) he was qualified for the position; and (4) he was rejected for the position under circumstances giving rise to an inference of unlawful discrimination." Brown v. McLean, 159 F.3d 898, 902 (4th Cir. 1998); accord Bryant v. Aiken Reg'l Med. Ctrs., Inc., 333 F.3d 536, 544–45 (4th Cir. 2003).

Although Witherspoon is a member of a protected class, he cites no evidence from which a rational factfinder could conclude by a preponderance of the evidence that he applied for the position in question. The evidence shows that Witherspoon created his online profile on NS's CareerTrack program, created and uploaded a resume, and created a Career Preference List. See Pl.'s Dep. 43:1–46:3; id. Exs. F & G. However, Witherspoon did not receive any email alerts and did not click "apply" in response to any email alerts. See Pl.'s Dep. 47:7–47:8 ("I was under the assumption that, you know, this advertisement must be open."). Consequently, Witherspoon did not actually apply for a promotion. See id.; Def.'s Mem. Attach. 2, ¶¶ 14–16. Thus, no rational factfinder could conclude that NS failed to promote Witherspoon due to his race. See, e.g., Brown, 159 F.3d at 903. Moreover, Witherspoon's mistaken belief that he had applied for the position does not excuse his failure to do so. See id. Finally, there are no grounds in this case for applying the "futile gesture"

12

doctrine. See, e.g., Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 364-68 (1977); Brown, 159 F.3d at 903–04.

Alternatively, even assuming that Witherspoon did in fact apply for a promotion, no rational factfinder could find that he was qualified for a promotion or that the circumstances surrounding NS's failure to promote him give rise to an inference of race discrimination in light of his violation of NS's zero-tolerance alcohol policy. Notably, Witherspoon was terminated almost immediately after he violated NS's zero-tolerance alcohol policy. The coincidental fact that Witherspoon allegedly applied for promotion shortly before he violated NS's zero-tolerance alcohol policy does not create a genuine issue of material fact. Accordingly, NS's motion for summary judgment is granted with respect to Witherspoon's failure to promote claim.

III.

For the reasons stated above, NS's motion for summary judgment is GRANTED. The clerk is directed to close this case.

SO ORDERED. This **2⁵** day of February 2008.

JAMES C. DEVER III
United States District Judge

13